## SUPREME COURT.

TRACY agt. TALMAGE, PRESIDENT OF THE NORTH AMERICAN
TRUST AND BANKING COMPANY.

*Free banks* have authority to buy, at discount, bonds, notes, or any evidences
of the public debt of a state.

They are not forbidden from giving their engagements on time, provided such
engagements are not adapted or intended to circulate as money.

They are not bodies corporate within the meaning of the Constitution, or the
General Banking Law.

Nor are they subject to penal regulations involving forfeiture or imprisonment,
enacted in reference to corporations proper.

*New -York General Term, Sept.* 1854.
Present, MITCHELL, P. J., ROOSEVELT and CLERKE, Justices.
The facts in this case are all stated in the opinion of the
court.

         DANIEL LORD, *for plaintiff.*
         WM. CURTIS NOYES, *for receiver.*

By the Court—ROOSEVELT, Justice. Among the claims presented for liquidation to the receiver of the late North American Trust and Banking Company, was one on behalf of the state of Indiana for $175,000, in the form of eighteen certificates of deposit of the denominations of nine and ten thousand dollars each, dated Jan. 2, 1841, and payable, with interest, at periods varying from five to twenty-two months after date. These certificates, it appears, were renewals of others previously given, and those again traced their origin to a written agreement of the 18th of January, 1839, between the Trust Company, a free bank formed under the general law, on the one part, and the Morris Canal Company (acting, according to the testimony, as agents for the state of Indiana) on the other. It was an agreement on the one part, without reference to any particular purpose, to sell twelve hundred " Bonds of the State of Indiana," and on the other to give in payment the " negotiable obligations " of the Trust Company, payable, not on demand, but on

Tracy agt. Talmage, President, &c.

time, with interest—the lowest denomination of which (the highest being $150,000) need not, by the terms of the agreement, have been less than $24,750.  Such an agreement, says the receiver, was an unlawful dealing by a corporation in public stocks, and an unlawful issuing by a corporation of a prohibited species of bank notes; and that no rights, therefore, cognizable by a court of justice, can accrue from it.

To understand the point of the receiver's objection to the claim, and of the answer to it, a brief recurrence to certain matters of public history is necessary.  For many years prior to 1838 the business of banking in this state was a chartered monopoly, made so by various express statutory provisions, denominated, collectively, " The Restraining Act."  This act, under severe penalties, prohibited almost every branch of banking to any person, company, or partnership, not specially authorized by corporate charters, doled out from time to time by successive legislatures to successive political or personal favorites.  The granting of these charters, as may readily be conceived, in time became a great abuse, so much so that the convention which was called, in 1821, to revise the state government, inserted in the then new constitution a provision requiring, thereafter, " the assent of two-thirds of the members elected to each branch of the legislature to every bill creating any body politic or corporate."

Favoritism, nevertheless, fortified as it was by the restraining act, still continued, with its attendant corruption, until public dissatisfaction became so strong and so universal that the legislature were at length compelled to extirpate the root of the evil.  Accordingly, on the 4th of February, 1837, so much of the restraining act " as prohibited a person, or association of persons, not incorporated, from keeping offices for the purpose of receiving deposits or discounting notes or bills," was repealed.  And on the 18th of April, in the following year, the whole system was remodelled, and the business thrown open to general competion by the passage of a law entitled, " An Act to authorize (instead of restraining) the business of Banking."

Under this act, on the 18th of July, 1838, twenty individuals, invited by the liberal character of its provisions, formed themselves into an association, or partnership, for which they assumed the name or style of "The North American Trust and Banking Company." The association, thus formed, construing the act which authorized their formation as expressly intended not to perpetuate, but to abolish the principle of corporate monopoly, and to restore in a great degree the natural system of free banking, (it was popularly called, "The Free Banking Law,") in January, 1839, as clearly stated, entered into a written contract with the agents of the state of Indiana, as any other company of individuals might have done, for the purchase, from them, on credit, of $1,200,000 of state bonds, which, immediately after, were delivered to, received by, and appropriated to the use of the company, and the whole purchase money, from time to time, as it fell due, regularly paid, except a balance, still outstanding, of about $175,000. This balance, in any form or to any extent, the receiver now refuses to recognize; insisting that the contract, out of which it arises, being, as he contends, prohibited by law, the association, as a consequence, were under no obligation either to pay for or return the bonds of the state, or to account for any portion of their avails.

The whole case, it will be seen, on the part of the receiver, (and here it seems to me is the error,) rests upon the assumption that whatever the legislature may have called these partnerships, or whatever may have been the legislative intention as to their character and denomination, yet, being in reality corporations, they are, and must be, *nolens volens*, subject to all existing prohibitory enactments, whether constitutional or merely legislative, affecting that kind of legal existences.

Now, whether the free banks are corporations or quasi corporations, or only associations possessed, like limited partnerships, of certain corporate attributes, is to my mind, for the purposes of the present argument, quite immaterial. The only question is, (all constitutional difficulties having been disposed

of,) did the legislature, in forming them, or rather, in author-
izing their self-formation, intend that certain penal provisions
of law, previously enacted to govern the action of chartered
banks—(undisputed corporations)—should apply to these new
forms of limited partnership; and is that intention, if enter-
tained by the law-making power, expressed in a manner so
clear as to require no implication or interpretation to discover
it; the rule being inflexible, and as just as it is inflexible, that
penal enactments, when not perfectly clear, admit of no exten-
sion by judicial inference.

To me it seems obvious, as well from the wording of the
free banking law, as from the whole history of its origin, prog-
ress, and final passage, that no such intention was entertained
by the legislature, and for the reason, mainly, that they wished,
as was indispensable, to avoid any application of the provisions
of the then Constitution, which precluded, according to the
universal understanding at the time, the creation or authoriza-
tion of corporate bodies by any general law. (See Assembly
Documents of 1838, No. 122, and the case of Beers and War-
ner, 22 *Wendell*, 103.) They accordingly, with an almost
hypercritical caution, whenever speaking of the contemplated
partnerships, denominated them " associations of persons," and
in their organization, made none of the usual provisions for
" directors ;" allowed no suits or conveyances except by, to,
or against the president for the time being, and by his natural
or individual name ; superseded the old-fashioned term stock-
holders by that of shareholders ; and instead of assuming that
all or any of the existing regulations in regard to corporate bodies,
would of necessity apply to the new associations, selected from
among these regulations a few deemed suitable and proper,
and expressly declared that those so selected—(thus clearly
rejecting all others)—should be binding upon these associa-
tions, " in the same manner as upon any (not any other) monied
corporation ;" and in a whole series, from year to year, of sub-
sequent statutes, uniformly spoke of " incorporated banking
institutions within this state,"—(see particulary act of May 7,
1839)—as distinguished and different from, and not synonymous

with, " associations authorized to carry on the business of bank. ing by virtue of the act of April 18, 1838."

What right, then, for the purpose of applying, not constitutional restrictions, but legislative penal enactments, have the judiciary to say, not merely that these " associations " are, but that they shall be deemed " bodies corporate," when the legislature have said—and said clearly and repeatedly, by the most unavoidable implication—that they shall not.

True, it is not competent to the legislature to compel a judge, as has been said, to make a thing white which in its nature is black; but it is competent to that department of the government to declare, and the judiciary will be bound by the declaration, that even a negro, black as an original Hottentot, shall, in the eye of the law, be deemed to be and have all the rights and privileges of the whitest specimen of the Circassian race. It is a mere question in that respect of legislative intention. The legislature, even as against undisputed corporations, had a perfect right to repeal absolutely any or all of these penal.laws, and, of course, as against the new " associations," to declare that, unless where specially applied, they should not be applicable. This, in effect, they have done, by declaring, in terms of the most pointed implication, that the free banking associations were not, and in no event should be deemed to be " bodies corporate or politic," but banking partnerships, with all the rights of natural persons, except as to issuing bills or notes to be put in circulation as money, and upon their compliance with the directions prescribed by the act, with only a limited liability for partnership debts. The late supreme court, notwithstanding the clear and undoubted evidences of the legislative intention, in two cases, soon after the passage of the Free Banking law, held, as in that view, and that view only, they had a right to hold that these associations, in spite of legislative definition to the contrary, were in fact bodies corporate, within the prohibition of the constitution.

In the court of errors, however, on appeal to the higher jurisdiction of that tribunal, and after the most elaborate discussion, an opposite conclusion was subsequently arrived at, as distinctly

expressed in a specific resolution (*see* 23*rd Wendell*) adopted 22 to 3, declaring "that the associations organized (under the general law) are not bodies politic or corporate within the spirit and meaning of the constitution."

The general banking law, under which the free banks are established, contains no provision expressly allowing, or expressly prohibiting, by that particular designation, the purchase of "state bonds." Fourteen of its sections are devoted entirely to securing the community, by proper safeguards, from losses which might arise, as they had too often arisen, out of a vicious paper currency—the remaining eighteen almost entirely to the removal of the then existing and much-complained of monopoly character of the previous New-York banking system, which, while it corrupted the legislature, denied to the great mass of people the exercise of their just and natural rights. By the first sections, notes intended for circulation as money were to be engraved under the direction of the comptroller, and countersigned in his office with a uniform signature, and secured by a deposit, with him, of public stocks, or of mortgages on real estate. By the other sections, the restraining act was to a great extent repealed, and the limited partnership act, in effect, enlarged; giving to the members of the new "associations," upon complying with the prescribed conditions, not only exemption from any liability beyond their share of the common stock, but also the faculty of transmitting such share, with its attendant responsibilities, to others, without involving a dissolution of the firm.

Contrary to the previous restricted policy, any person might now "establish offices of discount, deposit and circulation," and "associate," or, in other words, form partnership for that purpose—such associations to have "power to carry on the business of banking," and the "incidental powers" necessary for the management of such business. Under this act, and not under any charter of incorporation, the North American Trust and Banking Company was organized. It was authorized, among other things, therefore—for such are the terms of the act—"to discount," not only bills and notes, but "other evi-

dences of debt," without restriction, and to loan money on any kind of security, "real" or "personal." Now, "to discount" includes "to buy;" for discounting, in most cases, is but another term for "buying at a discount." (*See Richardson's Dictionary.*) And what is a bill? *Jacobs*, in his *Law Dictionary*, defines a bill to be a "common engagement for money given by one man to another; being sometimes with a penalty, called a penal bill, and sometimes without a penalty, then called a single bill, though the latter is most frequently used. By a bill," says he, "we ordinarily understand a single bond, without a condition." Consequently the company, under the power of "discounting bills," were authorized to buy bonds, especially single bonds; which (if we may assume as proof, matter of public notoriety) is the precise form of these state securities. They are simple acknowledgments of indebtedness and promises or engagements to pay, with interest, at a future specified period. They are seldom, even, under seal, although a "bond under seal" without a condition is none the less a note or bill, being denominated in law a "sealed note," or "single bill." The sealed notes in question are made, it is true, by a state, and not by an individual. But the act does not limit these associations to the purchase of the notes of individuals. The power granted by it is general, and without restriction, to discount any bills or notes.

Had the company, under this power, discounted a bond of the city of New-York, no one, I presume, would have doubted the legality of the act, and wherein, so far as the present point is concerned, do state bonds differ from city bonds? Should it be said that these state engagements are payable at a remote day, we may ask, is a written monied obligation less a bill, or note, if payable in twenty years, than if payable in twenty days? Or—for that is all we are required to establish—is the instrument less an "evidence of debt" when made by a state, and payable with interest at a long, than when made by an individual, or ordinary corporation, and payable at a short period? That the general power to purchase bills, notes, and other evidences of debt, carried with it incidentally, if not

Tracy agt. Talmage, President, &c.

directly, the authority to purchase state bonds, and that it was so understood by the legislature, is further obvious from the second section of the act, which provides, as originally passed, that whenever any person, or association of persons formed for the purpose of banking under the provisions of this act, shall legally transfer to the comptroller any portion of the public debt now created, or hereafter to be created, by the United States, or by this state, or such other states as shall be approved by the comptroller, such person or association of persons shall be entitled to receive from the comptroller an equal amount of circulating notes, &c.

Now, how, we may inquire, were those associations to transfer, if they could not buy any " public debt?" And where, in the act, is the authority to buy, unless it be contained in the words " power to carry on the business of banking, by discounting bills, notes, or other evidences of debt, or loaning money," or in the words " incidental powers necessary to carry on such business?" If the grant be not embraced in these words, it is nowhere. And yet, as will be seen, the legislature assumes (and such a definition is conclusive) that a grant of power to purchase " public debt," as well as private, is contained in the act; and as a consequence, by necessary implication, declares that the provision either was intended to give, and did give, the power so to do, or, more properly speaking, was intended to recognize, and did recognize, the natural right of associations, as well as individuals, to purchase and hold that class of obligations, as well as any other " bills, notes, and evidences of debt."

Thus do the terms, purchasing " evidences of debt," unrestricted, not only in their own nature impart the right to deal in the public debt of a state, but they are expressly assumed so to mean by the very legislature which used them, and in the very statute in which they were used. It may be that the grant was impolitic; but it is the office of the judiciary, in the language of the court of appeals, (2 *Selden*, 12,) "to administer the law as the legislature has declared it; not to alter the law by means of construction, in order to remedy an evil or incon-

venience (sometimes only imaginary) resulting from a fair interpretation of the law." Under the monopoly and restrictive system of restraining acts and chartered banks, as existing prior to 1838, it was usual, I admit, to prohibit these institutions from buying and selling state stocks. These special prohibitions, however, are only an additional evidence that, without them, under the general authority to bank, would have been included the power to buy and sell such stocks.

But it is sufficient to know that one object of the free banking law was to remove, not to increase restrictions; to overturn, and not to re-establish the chartered system. So strong, as already stated, had the public sentiment on this subject become, that as early as February, 1837, a year before the passage of the general banking law, the legislature were compelled to repeal all that portion of the revised statutes which prohibited individuals, " or associations of persons not incorporated," from keeping offices of discount and deposit. The general act, therefore, of 1838, in this respect, did but recognize and enlarge the restoration of the natural rights of the citizen established the year previous.

Again, the bonds or bills in this case, all or most of them, were payable in London. They were, in effect, if not in form, in the nature of exchange drawn by the state of Indiana on their bankers in England; and may fairly, therefore, without undue straining of language, in the absence of any express prohibition, be included in the power, expressly granted, of " buying and selling foreign coins and bills of exchange." They were engagements by the state to deliver so many pounds sterling in London, at the periods specified, in consideration of a certain number of dollars to be paid at certain other periods in New-York, by the banking company. At all events, it is conceded, and could not be denied, that the company had power to buy this class of " evidences of debt," for the purpose of depositing them with the comptroller. And the case shows conclusively, that neither the state itself nor the agents of the state had any notice or suspicion that the purchase was for any other object, or for any object whatever prohibited by law.

Tracy agt. Talmage, President, &c.

The courts of a state of the Union will not presume that the legislature of another state of the same Union intended to violate its laws, or to authorize any of its agents to do so.

The legislature, therefore, of Indiana must be taken to have authorized a lawful, and not an unlawful disposition of its bonds; and if the transfer in question (as we think we have shown it was not) was unlawful, it was not authorized by the state, and of consequence was of no effect to pass the title, and the state may now claim the restoration of the securities, or, in default of such restoration of the specific bonds, full payment of their value. So that whether the purchase was lawful or unlawful, the result substantially must be the same; and the court, "in furtherance of justice, would be bound, under the Code, to allow any amendment of the proceedings which might be necessary to adapt them to either view of the claimants' remedy. And this consideration, too, were there no other, furnishes a complete answer to the receiver's second objection, which goes ·to the form of the subsequently delivered evidences of the company's engagement to pay, and not to the engagement itself. For if these evidences, as interfering with the currency, were unlawful, the agents of the state of Indiana had no authority to receive them in fulfilment of the contract, and the ·act in that case did not bind their principals.

Second. But were "the negotiable obligations" of this "association of persons," as the law denominates them, payable on time, void by any statute on the subject existing in 1839, when the contract in question was made? By that contract which bears date the 18th of January, 1839, and covers the entire transaction of twelve hundred thousand dollars, two of the obligations to be given by the banking company were to be for $100,000, four for $150,000, eleven for $36,363.33 1-2, each, and one for $24,750—denominations of bills, it would seem, not very likely to enter into the currency, or to admit of any very striking "similitude to bank notes." Be this as it may, however, there was no statute, as I have shown in the case of the Palmers, lately decided by this court, prohibiting the giving of such obligations by the free banks prior to that

of May, 1840 ; and even that statute, as appears from its legis-
lative history, although expressly including associations, was
only intended to apply to "notes and bills issued or put in cir-
culation as money." Admitting, however, that it compre-
hended "obligations" such as the present, its very enactment
was an admission that no such prohibition previously existed.
Else why did it declare, in the form and with the title of
amendment, that "no banking association," (after the 4th of
June, 1840, for that is its legal effect,) "or individual banker,
as such, should issue, or put in circulation, any bill or note of
said association, or individual banker, unless the same should be
made payable on demand and without interest." If such was
the law already, why declare it over again, and why call the
act an amending act? Or, if its previous existence was so
doubtful as to require and receive a more explicit declaration
of the legislative will, what justice is there, the provision being
penal, in exacting on the part of strangers a previous knowl-
edge of its requirements on pain of forfeiture, fine, and im-
prisonment?

These obligations, however, (that is, for the $175,000 re-
maining unpaid,) although given before, were renewed, it is.
said, after the act of 1840, and were renewed in a form, being
for nine and ten thousand dollars each, somewhat modified, so
far as respects amounts, from that originally stipulated; al-
though even those sums, it is obvious, are altogether too large
to admit the idea of a currency. Assuming, however, that the
renewed certificates, whatever their denominations, are within
the act—a proposition, I imagine, which the district attorney
would find it not very easy to establish on a criminal trial—
they are, in that case, simply void, and leave the original obli-
gations standing in full force.

My conclusion, therefore, is, for the reasons above stated,
and others discussed by me more at length in deciding the case
of the Palmers, that the state of Indiana, in some one if not in
all aspects of the transaction, is entitled to recover, and that a
decree ought to be entered accordingly.